Memorandum of Decision
This is an action for the termination of the parental rights of Erin F. M., the mother of Katherine Marie M. The child was born on April 8, 1996. The hospital authorities requested the assistance of the Department of Children and Families, "DCF" immediately after the birth of the child due to the mother's mental health diagnosis, her lack of resources and lack of parental skills. The department sought and obtained an order of temporary custody of the child on April 12, 1996 (Driscoll, J.). The child has never resided with the respondent mother. On June 12, 1996, a finding was made and entered that Katherine was an uncared for child in that she had specialized needs which could be met only by a competent caretaker.
The court finds that the mother has appeared during the pendency of the case but did not appear on the date set for the termination trial. She has a court appointed attorney and a guardian ad litem both of whom attended the court hearing and examined the witnesses. The respondent-mother has actual notice of the trial date and was offered transportation by DCF to bring her to court. The court has jurisdiction in this matter; there is no pending action affecting custody of the child in any other CT Page 8628 court.
The respondent-mother, whose mental health problems will be later described, reported to the DCF social worker that the father of Katherine could be any one of eight possible men. She said she believed the father to be of Puerto Rican descent. She named one individual as the possible father but later advised DCF that this information was not correct. At some point during the pendency of this case, if not from the very beginning, it was known to DCF that the mother was married to a known individual. If the petitioner had been an attorney, it is likely that the petitioner would have known that in Connecticut a child born during lawful wedlock is presumed to be the child of the husband.Schaffer v. Schaffer, 187 Conn. 224, 226 (1982). Further, the public policy in favor of legitimacy is so strong that a higher burden of proof is required than mere contradictory evidence to disprove the presumption. See Holland vs Holland 188 Conn. 354,357 (1982) and Tait and LaPlant, Handbook of ConnecticutEvidence, Little Brown and Co., p. 105 (1988). Nonetheless, no effort was made by the petitioner to ascertain or correlate the information about the respondent mother's marital partner.
Practice Book section 32-4 requires the petitioner to file an affidavit reciting the efforts made to identify an unknown parent. The social worker in this case filed an affidavit with the petition indicating that mother would not name the father. "She (the mother) stated she would only tell the judge." (Affidavit dated September 26, 1997).
The petitioner, acting through Susan Wax, a DCF program supervisor, then commenced the action for termination of parental rights naming only the respondent-mother and requesting service of process only upon the respondent mother. The father of the child is not a party to this action and no effort appears to have been subsequently made to implead him.[2]
It is clear from a review of the file that the respondent-mother has appeared in court on a number of occasions in the past two years during the pendency of this case. It does not appear that mother was ever asked for the father's name while in court. It does not appear that DCF made reasonable efforts to ascertain the identity of the father, whether a name appears on the child's birth certificate, or whether any of the men named by the mother as significant relationships was ever contacted. Later when the Attorney General appeared as counsel for the petitioner, they did CT Page 8629 not seek an order of notice to an unknown person believed to be the father of a child born to Erin on April 8, 1996, nor did they attempt to elicit testimony regarding the father's identity from the child's mother before a judge. As noted earlier, the respondent-mother did not appear for the contested hearing on the termination of her parental rights. As a consequence of her failure to appear, this court was unable to inquire and is unable to act regarding the paternal rights of the child's father.
The court having read the verified petitions, the social studies, the various documents entered into evidence and having heard the testimony of the case worker, makes the following findings by clear and convincing evidence.
1. The child's mother, Erin, was an only child of a married Connecticut couple. She was born on July 26, 1960. Erin's parents have had difficulties with their daughter and have reported to be fearful of her. The parents are not themselves willing or able to care for the infant, Katherine, and report of no other available relatives as placement resources.
2. Erin quit high school in 1977. She reportedly completed a General Equivalency course and enlisted in the United States Marine Corps. While she was in the Marines, she had a nervous breakdown, was hospitalized and was subsequently awarded a General Discharge under Honorable Conditions. She receives a monthly check from the Veteran's Administration which apparently relates to her psychiatric disability. Her father receives the monthly check and pays her a weekly amount from the check.
3. The unchallenged history of Erin as reported in the Social Study (Petitioner's Exhibit #6) is that she has been diagnosed with paranoid schizophrenia and poly-substance abuse. She has reported admissions to Elmcrest Hospital, Lawrence and Memorial Hospital psychiatric unit and frequent admissions to the Backus Hospital Psychiatric unit as a result of hallucinations and delusions. The testimony and hospital records indicate that Erin is noncompliant with her anti-psychotic medications. As a result, she is frequently seen in the emergency room of local community hospitals. One such report indicated that she was delusional, and was a danger to her neighbors in that she would light a newspaper on fire in order to light her cigarettes. (Petitioner's Exhibit #A). At Reliance House, a residential shelter persons with disabilities, Erin was required to leave because she was considered to be a fire hazard and indicated she "wanted to kill CT Page 8630 them." On another more recent occasion, she was admitted to the Backus Hospital because "she is afraid she might die. She's been hearing voices, voices in the wall that are performing sex acts." (Exhibit A, last page).
4. Exhibit #B contains records from the Southeastern Mental Health Authority, a Department of Health and Addiction Services Program that attempted to help Erin. The Mobile Outreach case worker testified in court to the active intervention which she performed in order to try to assist Erin. This agency reports Erin to be schizophrenic and an abuser of both cocaine and alcohol. They have offered her inpatient programs, out patient programs and partial hospitalization programs, all without success. Services included administering her medications to alleviate her psychiatric symptoms, providing visiting nurses, transportation to psychiatric appointments, counseling and a recommended, dual diagnosis partial hospitalization program. She has been offered programs at the Women's Center and legal assistance for her reported domestic abuse problems. Erin not only does not accept the services, she actively avoids her case manager who tries to find her and bring her to her appointments.
This same exhibit "B," reports that in 1996, the year Katherine was born, Erin married one Delbert Street. That name "Street" also appears on some of Erin's earlier hospital records but no mention is made of this individual by DCF. The agency is aware of an unnamed man who had an abusive relationship with Erin, but it does not appear the case worker considered him a possible father of Katherine. If the caseworker did explore this possibility, she did not mention it.
5. The social service aid who monitored Erin's visitation with Katherine testified in court. She indicated that Erin was inappropriate in her care and attention to the child. She spoke to the child as an adult rather than as an infant. She held the child inappropriately, could not feed the child correctly even with repeated instruction, would often sit in a trance-like state, and most usually left the visit well before the hour had elapsed. On two occasions the police had to be summoned because of Erin's conduct. Erin came to visit the child on more than one occasion with the smell of alcohol on her breath. The social service aid did not consider the mother's conduct with the child to be age-appropriate.
6. Dr. Richard Sadler, the court appointed evaluator, CT Page 8631 testified that in his three hour interview and parent child evaluation, he could not himself have made a diagnosis of schizophrenia. In his presence, Erin appeared to maintain a "quite facile, socially competent, intellectually competent, interpersonally engaging and socially conventional discourse while maintaining that she is functioning quite well." (Exhibit #1 page 8). Dr. Sadler indicated however, that from her history, her presentation was consistent with a diagnosis of schizophrenia and that she has impaired child development understanding and impaired parenting skills. Based upon her reported history (the hospital records had not been made available to Dr. Sadler), Erin's impaired insight and judgement would place an infant at least at risk of significant emotional mistreatment. "[Erin's] judgement and intermittent relapses of her psychiatric condition would place a child in her care at serious risk . . . and this condition would not be expected to allow her to achieve sufficient stability to be able to individually parent this child."
7. No evidence was presented to show that since the adjudication of uncared for/specialized needs, Erin has successfully completed any psychiatric counseling, substance abuse program, parental education classes or has been compliant with her prescritive medication regime. The court finds by clear and convincing evidence that she is not now, nor within the reasonably foreseeable future, in a position to meet the child's needs.
 ADJUDICATION
With respect to the statutory grounds for termination of parental rights the court finds by clear an convincing evidence that this child was previously found to be have been uncared for on June 12, 1996. The father is unknown and is not a party to this proceeding. The court finds that mother has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child that she could assume a responsible position in the life of this child. General Statutes § 17a-112(c)(3)(B). The court finds that this ground has existed for more than one year.
With respect to the mandatory factual findings required by General Statutes § 17a-112(e), the court finds: CT Page 8632
1) The timeliness, nature and extent of services offered. The court finds that parental, substance abuse and psychiatric services were offered including residential and no-residential programs, transportation and visitation was offered and foster care was provided by DCF. (See Exhibits #4 and 6).
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980.[3] The mother has had more than enough time to demonstrate her desire to comply with her medication program and to stabilize herself to permit reunification and to achieve rehabilitation. The mother of the child was offered numerous psychiatric, substance abuse and dual diagnosis services which she did not choose to accept. The child protection agency orchestrated services and made reasonable efforts to effectuate reunification.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. The court finds that the mother did not fulfill or comply with the expectations dated May 30, 1996, described more fully in Exhibit #3. The testimony presented indicates a complete lack of cooperation with services, subsequent arrests and continued substance abuse.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. The court finds that the child is bonded to her present foster family, considers herself part of the family and that no presently existing emotional bonds will be broken by termination of the mother's rights.
5) As to the age of the child. The child is two years of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. In reJuvenile Appeal (84-CD), 189 Conn. 276 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD 99 (1979).
6) The efforts the parents have made to adjust their circumstances or conditions. The court finds that the mother has been unsuccessful in making any meaningful attempt to adjust her CT Page 8633 circumstances, conduct or condition to facilitate reunification.
7) The court finds that there has been nothing to prevent the mother from maintaining a meaningful relationship with the child. There was no unreasonable conduct noted by DCF. The child's reaction to the mother and to the visitation robustly indicated that continued visitation was not appropriate. An administrative hearing was conducted and confirmed the agencies actions.
The court finds, based upon the testimony and evidence presented, that it would be in the child's best interest to terminate the parental rights of the mother at this time. This finding is made after considering the child's sense of time, her need for a secure and permanent environment, the relationship that the child has with her foster parents, and the totality of circumstances that the termination of parental rights is in the child's best interest. In re Juvenile Appeal (Anonymous), supra,177 Conn. at 667-68.
 DISPOSITION
Based upon the foregoing findings, the court determines that it is in Katherine's best interest for a termination of parental rights to enter with respect to the mother Erin F. M. and, accordingly, a termination of the maternal parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent until the father is identified and included or excluded as a parental figure. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to find or eliminate the parental rights of the father so that permanent placement of this child may be arranged as required by State and federal law.
Francis J. Foley, Presiding Judge Child Protection Session